893 So.2d 456 (2004)
H. Charles SELLERS
v.
Peggy Robbins SELLERS.
2021230.
Court of Civil Appeals of Alabama.
March 12, 2004.
Rehearing Denied April 9, 2004.
Certiorari Denied June 11, 2004.
*457 William H. Mills of Redden, Mills & Clark, Birmingham, for appellant.
Submitted on appellant's brief only.
Alabama Supreme Court 1031118.
THOMPSON, Judge.
H. Charles Sellers ("the husband") and Peggy Robbins Sellers ("the wife") were married on December 23, 1957. Two children were born of the parties' marriage; at the time of the hearing in this matter, both children had reached the age of majority. The parties were divorced by a July 12, 1972, judgment of the trial court (hereinafter "the divorce judgment"). The divorce judgment awarded, among other things, custody of the parties' children to the wife, ordered the husband to pay the wife $100 per month in periodic alimony, and ordered the husband to maintain a $25,000 life-insurance policy for the benefit of the wife.
On June 20, 1974, the wife filed a petition to modify the trial court's July 12, 1972, divorce judgment, seeking, in part, an increase in the amount of periodic alimony from $100 to $200 per month. The trial court entered a judgment on July 18, 1974, awarding the wife $200 per month in periodic alimony.
On December 9, 2002, the husband filed a petition seeking to modify the trial court's original July 12, 1972, divorce judgment and its July 18, 1974, modification judgment. In his petition, the husband requested that the trial court terminate his periodic-alimony obligation and his obligation to maintain an insurance policy for the benefit of the wife. On February 18, 2003, the wife filed a counterpetition in which she requested an increase in periodic alimony.
On August 21, 2003, the trial court conducted a hearing and received ore tenus evidence and documentary evidence. On August 22, 2003, the trial court entered a judgment denying both parties' petitions and taxing the court costs to the husband. No postjudgment motions were filed, and the husband appealed.
Where a trial court receives ore tenus evidence, its judgment based on that evidence is entitled to a presumption of correctness on appeal and will not be reversed absent a showing that the trial court abused its discretion or that the *458 judgment is so unsupported by the evidence as to be plainly and palpably wrong. Scholl v. Parsons, 655 So.2d 1060 (Ala.Civ.App.1995). This "presumption of correctness is based in part on the trial court's unique ability to observe the parties and the witnesses and to evaluate their credibility and demeanor." Littleton v. Littleton, 741 So.2d 1083, 1085 (Ala.Civ.App.1999). This court is not permitted to reweigh the evidence on appeal and substitute its judgment for that of the trial court. Somers v. McCoy, 777 So.2d 141 (Ala.Civ.App.2000).
The testimony and evidence received at trial indicated the following facts. The parties were married for 14 years. At the time of trial in this matter, the wife was 72 years old. The wife never remarried following the parties' divorce. The wife has lived in Blowing Rock, North Carolina, since the parties' divorce. The wife testified that she was not employed at the time of the parties' divorce but that, shortly thereafter, she began working for Blowing Rock Attractions, a family business. According to the wife, Blowing Rock Attractions operates a tourist attraction located in western North Carolina. The wife testified that she initially earned approximately $100 per week from the business and that in 1989 she began managing the business. The wife owns a one-eighth share in the business.[1] The wife testified that she earns a net income of $1,334.80 per month. In addition to her monthly income, the business pays her health-insurance premiums in the amount of $262 per month. The wife testified that, at the time of trial, she had received $1,600 in dividends from her shares of stock in the family business.
The wife owns, or has an interest in, several pieces of real property. The wife testified that she owns her home and that the tax-assessed value of that home is $329,000. In addition to her home, the wife owns a one-third interest in a rental property valued at $420,000 and a one-eighth interest in a parcel of land valued at $50,000. According to the wife, she receives $450 per month in gross income from the rental property. The wife testified that she has a money-market account valued at $26,000 and that she also owns 10 shares of stock in Tweetsie Railroad. The wife testified that she does not have a retirement account or a 401(k) account. According to the wife, she is unable to retire and must continue working full-time.
The wife introduced her income-tax returns from the past six years into evidence at trial. The wife's 1997 income-tax return indicated that she had earned $8,169.28 in wages and that she had $100,037 in taxable income. In 1998, the wife earned $14,500 in wages and had $107,714 in taxable income. According to her 1999 tax return, the wife earned $15,500 in wages and had taxable income in the amount of $96,362. In 2000, the wife earned $42,227 in wages and had $100,018 in taxable income. The wife's 2001 tax return indicated that she had earned $64,011 in wages and that she had $104,498 in taxable income. In 2002, the wife earned $52,399 in wages and had a taxable income of $87,573. The wife testified that she used a substantial amount of her income to repay debts incurred over the years to help support herself and the children. According to the wife, the tourist-attraction business has dwindled since the events of September 11, 2001.[2] The wife testified that business had *459 been "off" in 2003 because the road leading into Blowing Rock had been washed out.
The husband was 71 years old at the time of the hearing in this matter. The husband married again in 1976. The husband testified that he and his current wife, Joan Sellers (hereinafter "Joan"), had been married for 27 years. The husband and Joan live in South Carolina. The husband testified that he moved to South Carolina in 1995, after he retired from McConnell Industries in Trussville, Alabama.
The husband testified that when the parties divorced, he was employed at Beloit Corporation in Pinson, where he earned approximately $30,000 per year. The husband testified that, while living in Alabama, he also began investing in rental property. According to the husband, he began investing in rental property in 1981, when he purchased a condominium in Gulf Shores and the house in which he now lives in South Carolina. The husband later acquired two additional condominiums in Gulf Shores, and another house in South Carolina.
The husband testified that, in addition to investing in rental property, he formed Snap & Back, Inc., a photo-finishing business. The husband testified that he operated the business as a photo-finishing business for 13 to 14 years before liquidating the assets in or about 1997. The husband testified that he did not dissolve Snap & Back, Inc., and that he used it as a vehicle through which to run his consulting business. The husband noted that he was a consultant for the forest-products industry. The husband testified that he had performed consulting work only once in 2003 and that he had earned $600 for that work.
The husband testified that, at the time of trial, he had disposed of all of his rental properties, with the exception of a resort home in Saluda, North Carolina. The husband testified that he acquired the North Carolina property in June 2002 in a "property swap." According to the husband, he realized a $323,000 return on his investment as a result of the "property swap." The husband testified that he did not invest that money in a guaranteed-return investment but, instead, used it to pay other debts. According to the husband, the North Carolina home is worth $331,000 and is unencumbered by indebtedness. The husband testified that he had received $5,800 in gross rental income from the North Carolina property at the time of trial. The husband testified that his and Joan's marital home is valued at $450,000. According to the husband, all of the real estate he owns is held in the name of the "Charles Sellers Living Trust." The husband testified that he created the trust four years before the trial in order to take advantage of tax laws.
The husband testified that in March 1999 he financed the purchase of a boat for $185,000. The husband stated that he spent $22,000 for improvements to the boat. The husband testified that in December 2002 he paid $1,272.40 towards the indebtedness on the boat. In 2003, the husband sold the boat for $170,000. According to the husband, he did not realize any profit from the sale of the boat.
The husband further testified that in 2002 he bought that year's model Jeep sport-utility vehicle for $27,566 in cash. The husband testified that he purchased the Jeep before he filed his December 9, 2002, petition to modify. According to the husband, he previously made $1,000 car payments on behalf of Joan; however, the husband noted that Joan recently purchased a new car, for which she paid cash.
*460 Several of the husband and Joan's joint tax returns were admitted into evidence at trial. The joint income-tax returns indicate that the husband and Joan reported a taxable income of $119,398 in 1999; $52,818 in 2000; $178,437 in 2001; and $76,680 in 2002. The husband testified that income received from stock dividends and any interest income were attributed to Joan. According to the husband, Joan inherited a substantial estate after the death of her parents and she regularly receives a significant income from investments. The husband testified that he had not transferred any assets to Joan or made any substantial gifts to her.
The husband testified that he is retired and in good health. According to the husband, his monthly income includes $634 from his pension, $1,180 from Social Security, and rental income from the North Carolina property. The husband testified that he does not have a retirement account or a 401(k) account. According to the husband, Joan contributes financially to his support.
On cross-examination, the husband testified that he is wealthier now than he was in 1974, when the 1972 divorce judgment was modified. A financial statement, prepared by the husband in anticipation of applying for a bank loan and admitted into evidence at trial, indicates that the husband assessed his net worth at $1,070,295. The husband informed the trial court that he filed his petition to modify because his income had substantially decreased and not because he could not afford to pay the periodic alimony or the insurance premiums.
The husband and the wife both submitted a list of their individual monthly expenses; the expense lists were admitted into evidence at trial. The husband submitted a list of monthly expenses totaling $5,765.41. The expense list provided by the wife indicated that her monthly expenses totaled $4,531.99. We note that neither party included a mortgage payment in his or her list of monthly expenses.
On appeal, the husband contends that the trial court abused its discretion by not eliminating his periodic-alimony obligation. Specifically, the husband argues that the wife no longer needs periodic alimony.
At the time of trial, the husband was 71 years old and the wife was 72 years old; both parties are in good health. The husband's and the wife's individual wealth has substantially increased since the parties divorced in 1972. The husband and the wife both own homes free of mortgage indebtedness. The husband and the wife both own rental property from which they receive rental income.
Both the husband's and the wife's respective financial status has improved since the parties' divorce. However, the record indicates that neither the husband nor the wife has saved money for retirement. Although the husband retired in 1995, he continues to work as a consultant. The husband receives money from his pension each month. The wife works for her family's business. The wife testified that the family business has dwindled and that, as a result, her income from stock in the family business has substantially decreased. According to the wife, she has spent a majority of her income repaying debts that she incurred while raising the parties' children. The wife testified that she is unable to retire and must continue to work full-time.
The husband testified at trial that his wealth has increased since the trial court's 1974 modification judgment. The husband owns two homes, worth a total value of $781,000, with no mortgage indebtedness *461 thereon. The husband has made purchases that substantiate his claim of wealth, including the purchase of a $185,000 boat and a 2002 Jeep, for which he paid $27,566 in cash. The record indicates that the same month that the husband filed his petition to modify, seeking to terminate his periodic-alimony obligation, he purchased a Jeep and paid $1,272.40 towards his boat payment. A financial statement prepared by the husband states that he has $1,070,295 in total assets. The evidence before the trial court, including the husband's own testimony, demonstrates that the husband was capable of meeting his periodic-alimony obligation of $200 per month and maintaining a $25,000 life-insurance policy for the benefit of the wife.
"`It is well established in Alabama that the modification of an alimony provision based upon changed circumstances is a matter that rests within the [trial] court's sound discretion.'" Stinson v. Stinson, 729 So.2d 864, 868 (Ala.Civ.App.1998) (quoting Ex parte Millard, 683 So.2d 1002, 1003 (Ala.1996)).
"The modification of periodic alimony is a matter within the discretion of the trial court, and on appeal its judgment on that matter is presumed correct.... The trial court may modify an award of periodic alimony if the petitioner proves that a material change of circumstances has occurred since the last award was made. The trial court may consider several factors, including the earning capacity of each spouse, the recipient's needs and the payor's ability to meet those needs, and the estate of each spouse."
Kiefer v. Kiefer, 671 So.2d 710, 711 (Ala.Civ.App.1995) (citations omitted). Furthermore, this court is not permitted to reweigh the evidence on appeal or to substitute its judgment for that of the trial court. See Ex parte Bryowsky, 676 So.2d 1322 (Ala.1996). Given the evidence presented to the trial court, we cannot say that the trial court's judgment, insofar as it declined to modify the provisions contained in the July 12, 1972, divorce judgment and the June 20, 1974, modification judgment, was in error.
The judgment of the trial court is due to be affirmed.
AFFIRMED.
YATES, P.J., and PITTMAN, J., concur.
CRAWELY, J., dissents, with writing, which MURDOCK, J., joins.
CRAWLEY, Judge, dissenting.
I must respectfully dissent from this court's affirmance of the trial court's denial of the former husband's petition to terminate his obligation to pay alimony and life insurance premiums in the present case. I write to specifically explain my reason for dissenting on the alimony issue.
"An obligation to pay alimony may be modified only upon a showing of a material change in circumstances that has occurred since the trial court's previous judgment, and the burden is on the party seeking a modification to make this showing. Thus, the moving party must show a material change in the financial needs of the payee spouse and in the financial ability of the payor spouse to respond to those needs."
Glover v. Glover, 730 So.2d 218, 220 (Ala.Civ.App.1998) (citation omitted).
"[T]he purpose of periodic alimony is to support the former dependent spouse and enable that spouse, to the extent possible, to maintain the status that the parties had enjoyed during the marriage, until that spouse is self-supporting or maintaining a lifestyle or status similar *462 to the one enjoyed during the marriage."
O'Neal v. O'Neal, 678 So.2d 161, 164 (Ala.Civ.App.1996). Although a trial court's judgment on a petition to modify alimony is presumed correct, this court can reverse a trial court's judgment if it is not supported by the evidence, is plainly and palpably wrong, and amounts to an abuse of discretion. Id.
I recognize that a trial court is not required to modify alimony because of a change in the circumstances of the parties. Kiefer v. Kiefer, 671 So.2d 710, 711 (Ala.Civ.App.1995). However, the trial court should still consider the earning capacity of each spouse, the payee spouse's need for alimony, the payor spouse's ability to pay alimony, and each spouse's estate when determining whether termination of the periodic-alimony obligation is warranted. Kiefer, 671 So.2d at 711. My review of the present case convinces me that the trial court abused its discretion in failing to terminate the former husband's periodic-alimony obligation.
In my opinion, the $2,400 in periodic alimony the former wife receives annually is insignificant in providing support to her. In 2002, the former wife's taxable income was $87,573, and she had additional tax-exempt income of $2,870. In the five years before 2002, her taxable income was over $100,000 every year but 1999, in which it was $96,362.
The former wife is self-supporting and no longer needs support from the former husband; in fact, the parties have relatively equal incomes each month. In addition, after the divorce in the present case, both parties pursued independent careers that led them to increased wealth and a standard of living that exceeds the standard of living that the parties enjoyed while married. Therefore, I conclude that the trial court abused its discretion in denying the former husband's petition to terminate his alimony obligation. I must respectfully dissent.
MURDOCK, J., concurs.
NOTES
[1] After the wife's mother died in 1988, Blowing Rock Attractions became a "subchapter-s" corporation with eight shareholders, each holding 100 shares of stock in the company.
[2] On September 11, 2001, two commercial airliners were hijacked by terrorists and flown into the World Trade Center in New York City, causing the two towers to collapse; another airliner was hijacked and flown into the Pentagon building in Washington, D.C.; and a fourth hijacked airliner crashed into a field in Pennsylvania. The three incidents resulted in the loss of thousands of lives.